## Case No. 9,858.

### MORSE et al. v. O'REILLY.

[4 Pa. Law J. Rep. 75; 6 Pa. Law J. 501.]

Circuit Court, E. D. Pennsylvania. Sept., 1847.

CONTRACTS — VIOLATION — IMPOSSIBLE OF EXECUTION—FORFEITURE—PRACTICE IN EQUITY —PATENTS.

1. The process of a court of equity will not be afforded for the purpose of enforcing a forfeiture.

2. When a contract has been violated in its essential terms, or when it has been made impossible of execution, equity will relieve, if it can do so without prejudice; but it never enforces anything in the nature of a forfeiture whether stipulated in the contract or implied from circumstances.

3. While the exclusive rights of a patentee are specially guarded from intrusion, the contracts which he makes to share them with third persons are interpreted and enforced in the same manner as other legal engagements.

[Cited in May v. Chaffee, Case No. 9,332.]

4. An injunction will not be granted against waste, where the title of the complainant is denied by the answer, and it is refused before answer, unless the defendant has had notice of the motion so as to enable him to make denial by affidavits.

This was an application for a special injunction. The bill was filed January 5, 1847. Upon the hearing, it appeared from the bill and affidavits read by the complainants, and the counter affidavits suffered by the court to be read on the part of the respondents, that on the 13th June, 1845, the complainants, who were patentees of Morse's electro-magnetic telegraph, entered into a contract with the respondent, Henry O'Reilly, in which he stipulated at his own expense to use his best endeavors to raise capital for the construction of a line of Morse's electro-magnetic telegraph to connect the great sea-board line at Philadelphia or at such other convenient point on said line as may approach nearer to Harrisburg in Pennsylvania, etc., etc., to Pittsburgh, St. Louis, and the principal towns on the lakes. In consideration whereof it was agreed on the part of the complainants, that when the said O'Reilly shall have procured a fund sufficient to build a line of one wire from the connecting point aforesaid to Harrisburg, or any point farther west, to convey the patent right to said line so covered by capital in trust for themselves, and the said O'Reilly and his associates on the terms and conditions set forth in the articles of agreement and association constituting the "Magnetic Telegraph Company," and providing for the government thereof with the following alterations viz: "The amount of stock or other interest in the lines to be constructed, reserved to the grantors and assigns, shall be one-fourth part only, and not one-half of the whole, on so much capital as shall be required to construct a line of two wires, but in all cases of a third wire, or any greater number, the stock issued on the capital employed for such additional wire or wires shall be equally divided between the subscribers of

such capital and the grantors of the patent right or their assigns. No preference is to be given to the party of the first part and his associates in the construction of connecting lines, nor shall anything herein be construed to prevent an extension, by the parties of the second part, of a line from Buffalo, to connect with the lake towns at Erie; nor to prevent the construction of a line from New Orleans to connect the Western towns directly with that city; but such line shall not be used to connect any Western cities or towns with each other which may have been already connected by said O'Reilly.". In case of a sale of the entire patent right to the government, the grantors shall be bound to pay the actual reasonable cost of the lines constructed under this agreement, with twenty per cent. thereon, and no more, to vest the government with the entire ownership of such lines; provided, as specified in the articles of agreement of the "Magnetic Telegraph Company," the purchase be made or provided for by congress before the 4th of March, 1847 (eighteen hundred and forty-seven.) "The tariff of charges on the lines so constructed, shall conform substantially to the tariff of charges on the great seaboard line before named, and in no case to be so arranged as to render the lines unequal in this respect, to the prejudice of either. Unless the line from the point of connection with the sea-board route shall be constructed within six months from date to Harrisburg, and capital provided for its extension to Pittsburgh within said time, then this agreement, and any conveyance in trust that may have been made in pursuance thereof, shall be null and void thereafter, unless it shall satisfactorily appear that unforeseen difficulties are experienced by said O'Reilly and his associates in obtaining from the state officers of Pennsylvania the right of way along the public works, and in that event the conditional annulment aforesaid shall take effect at the end of six months after such permission shall be given or refused. And any section beyond said last point, embraced within the provision of this agreement, which shall not be constructed by said O'Reilly and his associates, within six months after said parties of second part shall request said O'Reilly to cause such lines to be constructed, so as to extend the connection at least one hundred and fifty miles beyond said last point, and in like ratio during each succeeding six months thereafter; then, in relation to all such sections of the line, this agreement shall be null and void, provided that such request shall not be made prior to the 1st day of April next, 1846." "And the party of the second part shall convey said patent right, on any line beyond Pittsburgh to any point of commercial magnitude, when the necessary capital for the construction of the same shall have been subscribed within the period contemplated by this agreement, by reasonable persons, and not otherwise."

The following is the preamble to the articles of association referred to in Mr. O'Reilly's contract, and made a part thereof, viz.: "Whereas, Samuel F. B. Morse, Leonard D. Gale and Alfred Vail, by their attorney, Amos Kendall, and Francis O. J. Smith, in his own right, sole proprietors under the letters patent of the United States, of the right to construct and use Morse's electro-magnetic telegraph, on the main line of communication from the city of New York, through Philadelphia and Baltimore, to the city of Washington, have by deed of trust, bearing even date herewith, conveyed the same exclusive right to W. W. Corcoran and B. B. French, in trust, for the use of the said proprietors and the subscribers to the stock of the Magnetic Telegraph Company, with the limitations, under the conditions and in the manner set forth in said deed and in these articles of association, whose names are hereunto affixed, do hereby constitute ourselves into a joint stock company to be called the 'Magnetic Telegraph Company,' for the purpose of constructing and carrying on a line of said telegraph from New York to Washington, as aforesaid, according to the following principles and regulations."

The following are a portion of the powers vested in the trustees by those articles, viz.: "Article 9. The trustees shall have the power, and it shall be their duty forthwith to appoint the necessary agents, and take steps to secure the right of way to construct a line of telegraph, consisting of one or two wires, from New York to Philadelphia, and from time to time to call in such instalments of the capital stock as may be requisite for that purpose. After the company shall provide a treasurer, all moneys collected for or belonging to the company, shall be paid to the treasurer for the time being, who shall pay out the same only upon the written order of a majority of the trustees. But until a treasurer shall be appointed, the trustees shall perform the duties of treasurer. Article 10. They shall prepare forms of certificates and regulate transfers of stock, and audit all accounts for expenditures made in the construction or management of the telegraph, and generally to superintend the financial interests of the company. Article 11. They shall prepare a tariff of charges and a system of regulations for the management of the telegraph, which they shall submit to a meeting of the stockholders, to be called in due time before the line from New York to Philadelphia shall be ready to go into operation."

The only mode by which a board of directors could be constituted, is described in the following article, viz: "Article 17. Regular meetings shall be held annually or semi-annually, as the company may hereafter decide. At any regularly called meeting of this company it shall be competent for the company, in the manner of deciding any

other proposition, to divest the trustees of all the powers herein vested, excepting the trust of the title of said letters patent, and the issuing of certificates of stock, and to transfer the same to and invest them in a board of directors, to consist of not less than five persons, to be thereafter elected at each annual meeting of the company, and to continue in office until new directors shall be elected; and thereafter such directors shall do and perform all the duties otherwise devolved upon the trustees as herein provided and generally superintend the administrative concerns of the company; and all officers and agents not herein specially provided and instructed, shall be subject to the direction of the directors."

It further appeared from an affidavit produced upon the call of the court after the argument had closed, that the complainants, on the 21st of December, 1846, before the filing of the bill, had formally conveyed to Eliphalet Case all their right of constructing and using the magnetic telegraph, with all its incidents, on the line embraced in Mr. O'Reilly's contract, and the assignment was recorded in the patent office two days after.

The complainants prayed for an injunction, upon the ground that the contract had become forfeited by a breach of its provisions, upon the part of the respondents, who had organized three several and distinct companies, appointed directors and other officers, and issued certificates of stock, without the consent and knowledge of the patentees, and without having first complied with the terms of the contract by having the property vested in trustees. It was also contended that O'Reilly had not, within the six months conditioned by the contract, provided funds for the extension of the line to Pittsburgh.

The respondents' affidavits did not deny the complainants' title, but asserted rights under it by force of the contract, which the respondents alleged they had substantially complied with.

Cadwallader, Miles & Williams, for the motion.

The respondents in this issue cannot question the title of the complainants, and the only ground, they have to stand on is the license they have obtained from the latter as patentees. See Baird v. Neilson, 8 Clark & F. 726. Such a license however does not protect them unless they are acting strictly under its terms. If they have failed to comply with any of its requisitions in point of time, which it is conceded on all sides they have, they cannot set it up in bar of this application. Withy v. Cottle, 1 Turn. & R. 78; Doloret v. Rothschild, 1 Sim. & S. 590; Coslake v. Till, 1 Russ. 376; Hagedon v. Laing, 1 Marsh. 514–518; M'Crelish v. Churchman, 4 Rawle, 26; Sparks v. Liverpool Water-Works, 13 Ves. 428; Benedict v. Lynch, 1 Johns. Ch. 374, 375; Payne v. Banner, 7 Jur. 1051. Time is particularly of the essence of this contract, seeing that the rights under it, by the provisions of the patent law are running out by time. A patentee has a peculiar right to call upon a court of equity for immediate relief when his patent right, during the limited period for which he is entitled to its exclusive benefit, has been invaded by a stranger. So far has this principle been carried that a court will grant an injunction, even though it may doubt the validity of the patent right. Boulton v. Bull, 3 Ves. 140; Harmer v. Plane, 14 Ves. 136; 6 Ves. 707; 3 P. Wms. 225, in note; Bonaparte v. Camden & A. R. Co. [Case No. 1,617].

Neither of the respondents, or any party claiming through them, can be here considered as an innocent purchaser without notice, since the legal title has throughout remained in the complainants. It was to be conveyed to the trustees under the article of agreement, until the completion of certain conditions. The title was never to be alienated from the trustees, and no stock could be created or certificate issued without them. The title being thus in the patentees, no right or title as purchasers could exist without notice to or inquiry of them. The governing principle is that a purchaser of an equitable interest must take notice of the outstanding legal interest, and of the equities arising from it. Shirey v. Kagg, 7 Cranch [11 U. S.] 48; Vatier v. Hime, 7 Pet. [32 U. S.] 271, 272; Boon v. Chilles, 10 Pet. [35 U. S.] 210–212.

If a party by his own act disables himself from performing his contract in the same manner and plight as that in which he has engaged to perform it, the other party may annul the contract within a reasonable time, after being fully apprised of what has been done, although the contract may have been partially executed. Litt. Ten. §§ 355, 358; Co. Litt. 228 a, b.; 10 Coke, 49b.; 3 Com. Dig. "Covenant," E. 2; 1 Sid. 48; Robinson v. Ant, Ld. Raym. 25; Rolle, Abr. "Condition." A, pl. 1; 5 Vin. Abr. 221, 224; Robson v. Drummond, 2 Barn. & Adol. 303; Smith v. Packhurst. 3 Atk. 141; Skilleen v. May, 4 Cranch [8 U. S.] 137; Ong v. Campbell, 6 Watts, 392; 1 Atk. 171.

Watts & Meredith, for respondents.

First. As to non-performance within the time specified. The complainants in order to avail themselves of this ground, must show a strict performance on their side of the agreement. The complainants themselves failed in establishing what was a condition precedent on their part, a point of connection at Lancaster. But, in effect, the condition on part of the respondents was substantially complied with by them within the proper period. Second. The organization of the Atlantic & Ohio Company is not in violation of the agreement between the parties. That agreement contemplates directly a general association, but it does not negative sectional associations. Such sectional associations were constantly instituted by complainants,

and had become part of the general management of the patent. But the erection of such a subordinate association is nothing more than must necessarily take place under any general company of the character of that under the respondents' control. There must always be book-keepers, clerks and collectors, and it makes no matter what name may be given them. Third. As to the gratuitous issue of stock. There could be no injury to complainants by such gratuitous issue. They are entitled to just the same profits and same interest and same proportion in the capital, whatsoever be the issue of stock to others. Fourth. As to excessive cost. Such expenditures do not injure the patentees. On the contrary, if it is bona fide, it is beneficial to the patentees in proportion to its amount. But, generally, if this contract has been forfeited the forfeiture has been waived by the parties and the subsequent procedure of the respondents under it, ratified by the complainants.

KANE, District Judge. This case came before me, and has been discussed, as a motion for a special injunction at the instance of the proprietors of a patent right. The defendants' affidavits do not controvert the complainants' title, but they assert rights under it by force of a contract. The complainants, on the other hand, do not deny the contract, but allege that it has become forfeited by a breach of its provisions. This is the state of the case, as it appears upon the record, and substantially as it has been argued by the counsel on both sides. Essentially, therefore, the application is for the aid of the summary process of the court to enforce a forfeiture. I am not aware that such an application has been sustained by a court of equity in any case; and though called on by me, the counsel for the complainants have not found one. I am warranted in assuming, therefore, that the uniform chancery practice has been against such an exercise of jurisdiction, and this is certainly not a case of which the merits are so obvious as to invite innovations in its favor.

To escape from this, it has been contended that the defendants have incapacitated themselves from performing their contract or compensating for their default. This, however, is only another, and, as it seems to me, a less forcible form of alleging that they have forfeited it. Whether the contract has been violated in its essential terms, or whether it has been made impossible of execution; equity will relieve, if it can do so without prejudice; but it never enforces anything in the nature of a forfeiture, whether stipulated in the contract or implied from circumstances. Of course I do not refer to conditions precedent. It is a mistake of terms to speak of such conditions as affecting at this time the rights of these parties. Such conditions are at an end, when the right has become vested. They precede the operations of the grant; and the very reason why equity never relieves against them, is that it can only control the exercise of rights, and cannot confer them. The rights of Mr. O'Reilly vested to a certain extent on the execution of the written agreement of the 13th June, 1845; and they were absolutely fixed when he had "procured a fund sufficient to build a line of one wire from connecting point," with the seaboard line "to Harrisburg." From that time the condition precedent had performed its office, and his rights could be divested only by a forfeiture.

It did not vary the effect of his agreement, that the subject matter of it regarded a patent right. The exclusive rights of a patentee are specially guarded from intrusion; but the contracts which he makes to share them with third persons are interpreted and enforced just as other legal engagements. Nor is anything gained to the complainants, by assimilating the case to one of waste. An injunction is not granted against waste, where the title of the complainant is denied by the answer; and it is refused before answer unless the defendant has had notice of the motion, so as to enable him to make the denial by affidavits. 19 Ves. 147; 17 Ves. 110. In the case before me, the defendants assert that they are in possession under title, and the very issue is whether they are so or not.

I have thus considered the arguments of the counsel, as if the case were really between the proprietors of a patent right on the one side and the defendants on the other. But it is not so. The exhibit referred to in Mr. Kendall's affidavit which was produced upon the call of the court after the argument had closed, shows that the complainants have not, and had not at the time of filing their bill, any title to that character, so far as regards the subject of contest here. On the 21st of December, 1846, they formally conveyed to Eliphalet Case all their right of construction and using the magnetic telegraph, with all its incidents on the lines embraced in Mr. O'Reilly's contract and the assignment was recorded in the patent office two days after. The bill was filed on the 5th day of January, 1847. I need hardly say that this fact destroys the basis of the complainants' case. An injunction cannot be awarded at the instance of a stranger, and a patentee, who has assigned away his interest is nothing more.

For these reasons, the motion is refused. I may add, as the request has been made that I should express an opinion upon the merits of the controversy, that I have seen nothing in the facts that have been developed to call for a different conclusion from that to which abstract principles have directed me. Injunction refused.

See Goesele v. Bimeler [Case No. 5,503]; Burr v. Duryea [Id. 2,190]; Perry v. Parker [Id. 11,-010].